UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Matthew Kalil,

      Plaintiff,

v.

Haley Kalil

      Defendant.

Case No: 0:26-cv-00062

**MEMORANDUM OF LAW
IN SUPPORT OF DEFENDANT'S
MOTION TO DISMISS**

## <u>INTRODUCTION</u>

Plaintiff's Complaint seeks to hold a woman in the public eye civilly liable for providing a truthful, autobiographical account of sexual trauma she suffered and described as having led to the end of a highly publicized celebrity marriage with an NFL football star. Allowing this case to proceed as pled would require this Court to radically expand state-law causes of action beyond their recognized boundaries into territory fiercely protected by the First Amendment. No court anywhere in the country has recognized the viability of an invasion-of-privacy or unjust-enrichment claim in circumstances remotely similar to those presented here.

A motion to dismiss is appropriate because this case presents a set of undisputed facts and purely legal issues that are frequently and properly resolved at the pleading stage.

A federal court sitting in diversity jurisdiction is tasked with predicting how the state courts would rule. It may not, however, expand state-law causes of action beyond their existing contours or create new theories of liability untethered from established

law—particularly where doing so would push state law beyond constitutional limits. Because the relief sought here would require precisely that kind of impermissible expansion, the claims must be dismissed.

## STATEMENT OF FACTS

### I.    GENERAL BACKGROUND.

Plaintiff Matthew Kalil is a former NFL player who played for the Minnesota Vikings, Carolina Panthers, and Houston Texans before retiring in 2019. Compl. ¶¶ 6, 13. Defendant Haley Kalil is a model, actress, and social media entertainer who held the titles of Miss Minnesota Teen USA in 2010 and Miss Minnesota USA in 2014 before appearing in the *Sports Illustrated* Swimsuit Issue in 2017. *Id.* ¶¶ 7, 12. The parties met while the Plaintiff played for the Minnesota Vikings and were married in 2015. *Id.* ¶ 11.

On May 4, 2022, Defendant filed for divorce from Plaintiff, and the divorce was finalized later that year. *Id.* ¶ 15.

According to the Complaint, after the divorce Plaintiff "quickly and quietly receded from the public eye" to focus on "investing in private business ventures." *Id.* ¶¶ 13–14. Plaintiff currently resides in California. *Id.* ¶ 6.

As for Defendant, her "celebrity status increased," and she "intentionally sought the public attention." *Id.* ¶ 17. Defendant has cultivated a massive audience, boasting 15.9 million followers on TikTok, 9.3 million followers on Instagram, and over 8 million subscribers on YouTube. *Id.* ¶ 20. Defendant's "influence continues to grow," evidenced by her nomination for a 2023 Streamy Award, her inclusion in *Time Magazine*'s list of

"Top 100 Creators," and her collaborations with major celebrities such as Jared Leto and Ed Sheeran. *Id.* ¶¶ 18, 22. Defendant currently is a citizen of New York.  *Id.* ¶ 7.

## II.    THE NOVEMBER 2025 INTERVIEW.

On November 4, 2025, Defendant participated in a livestream interview with content creator Marlon Garcia. *Id.* ¶¶ 25, 28. The broadcast, titled "I opened up to Haylee Baylee," was filmed in Minnesota as part of Garcia's "Mar-Athon" streaming challenge. *Id.* ¶¶ 26–29. During the segment in question[1], Defendant spoke extensively and candidly about her past marriage to the Plaintiff, framing their relationship not as a failure, but as a loving union that was ultimately hindered by an unfortunate physical incompatibility. Ex. A to Decl. of Matthew Bialick ("Tr."), at 2:1–23:17.

Far from disparaging the Plaintiff, Defendant repeatedly praised his character and the quality of their marriage throughout the interview. *Id.* at 4:13–14; 14:10–11. She unequivocally described the Plaintiff as "the greatest guy in the world." *Id.* at 4:13–14. She explained that their connection was founded on a deep connection, noting that they were "best friends." *Id.* at 4:25. Reflecting on their time together, she stated she felt "really lucky" to have been with him. *Id.* at 14:11. She portrayed the marriage as exceptionally harmonious, noting that in seven years they "never fought" and "never yelled at each other a single time during [their] whole marriage." *Id.* at 14:6–8. She

---

[1] The Complaint incorporated by reference minutes 34:00-36:00 of the interview by including a link to the currently active YouTube page containing the interview.  *Id.* ¶ 29. Defendant had the referenced portion of the interview transcribed for this motion.  Note that Defendant is referred to in the transcript as "Ms. Baylee" which is her stage name.

credited him with her own personal growth, stating, "he made me want to be a way better person." *Id.* at 23:11–14.

Defendant's discussion of the divorce focused on a specific anatomical incompatibility that rendered a normal sexual relationship impossible. *Id.* at 8:16-11:2.[2] Describing the issue to the host, Defendant estimated that the size of Plaintiff's genitalia placed him in the top ".01 percent of the population." *Id.* at 10:14–15. To illustrate the extreme nature of the incompatibility, she described the size as comparable to "two coke [cans] stacked on top of each other," or "maybe even a third." *Id.* at 18:22–23. She explained that because of this disparity, sexual intercourse was "impossible" and would leave her "in tears." *Id.* at 10:25–11:2. She clarified that this was not a fault of the Plaintiff, but rather "just bad luck." *Id.* at 12:12.

Defendant further detailed the couple's desperate, years-long efforts to overcome this physical barrier and save their marriage. *Id.* at 9:11. She stated that she "was going to try it all," including consulting "therapists [and] doctors." *Id.* at 9:12–13. She even investigated surgical interventions, noting she "[l]ooked up, like, lipo type [procedures]." *Id.* at 9:15–16. She emphasized that they "tried everything" and that "neither of [them] did anything" wrong; rather, the physical reality simply made the relationship unsustainable. *Id.* at 12:13–20. Ultimately, Defendant explained that the split occurred

---

[2] As alleged in the Complaint, Defendant never actually referred to Plaintiff's genitalia directly at any point, instead she typed messages to Garcia on her phone and then discussed what she typed. *Id.* ¶ 30. The Complaint alleged that "viewers could and did readily infer that she was referring to Plaintiff's genitalia and their private sexual relationship during their marriage." Given that this is a Rule 12(b)(6) motion, we will assume these allegations to be true. *Id.*

because, despite their love and efforts, the incompatibility meant they were better suited as "homies" than spouses. *Id.* at 10:6.

## III.    SUBSEQUENT MEDIA COVERAGE AND PUBLIC DISCUSSION.

Following the November 4, 2025 livestream interview, Defendant's statements received widespread media attention across national and international outlets. Compl. ¶¶ 41–44. Numerous media organizations reported on the interview and discussed Defendant's remarks, including TMZ, Fox News, and LADBible which had the effect of "dramatically expanding the reach and impact of the disclosure". *Id.* ¶¶ 41, 42. These media reports, in turn, have resulted in extensive discussion and comments from the general public. *Id.* ¶¶ 46-50.

## <u>LEGAL STANDARDS</u>

## I.    MOTIONS TO DISMISS.

To survive a motion to dismiss, a complaint must contain sufficient factual matter to "state a claim to relief that is plausible on its face." *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A claim is plausible only when the factual content allows the Court to draw a reasonable inference of liability; facts merely consistent with liability stop short of the line between possibility and plausibility." *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 548 (2007).

The Court must accept factual allegations as true but is "not bound to accept as true a legal conclusion couched as a factual allegation." *Id.* at 555. Conclusory statements and "[t]hreadbare recitals of the elements" are insufficient. *Iqbal*, 556 U.S. at 678.

The Court may consider the pleadings, matters of public record, and materials

5

"necessarily embraced by the pleadings," including documents whose contents are alleged in the complaint but not physically attached. *See Mattes v. ABC Plastics, Inc.*, 323 F.3d 695, 697 n.4 (8th Cir. 2003).

## II.    CHOICE OF LAW

In a diversity action, a federal district court must apply the choice-of-law rules of the state in which it sits. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941); *Whitney v. Guys, Inc.*, 700 F.3d 1118, 1123 (8th Cir. 2012). Because this Court sits in Minnesota, Minnesota's choice-of-law rules govern the determination of which state's substantive law applies to this dispute.

Under Minnesota law, the Court must first determine "whether the choice of one state's law over another's creates an actual conflict." *Jepson v. Gen. Cas. Co. of Wis.*, 513 N.W.2d 467, 469 (Minn. 1994). If an actual conflict exists, the Court must next verify that the law of each state may be constitutionally applied. *Id.* If both laws can be constitutionally applied, the Court resolves the conflict by applying the five "choice-influencing factors" articulated in *Milkovich v. Saari*, 203 N.W.2d 408 (Minn. 1973). *Jepson*, 513 N.W.2d at 470.

The five choice-influencing factors are: (1) predictability of result; (2) maintenance of interstate and international order; (3) simplification of the judicial task; (4) advancement of the forum's governmental interest; and (5) application of the better rule of law. *Jepson*, 513 N.W.2d at 470. These factors are not intended to be applied as "mechanical rules" but rather to prompt courts to "carefully and critically consider each new fact situation." *Id.*

With that framework established, the Court may turn to the application of Minnesota's choice-of-law principles to the claims asserted here. In theory, three bodies of law could be implicated: Minnesota, as the forum state where the interview occurred and where the parties resided during the events giving rise to the claims; California, where the Plaintiff currently resides and where any alleged embarrassment would be experienced; and New York, where the Defendant currently resides. New York's only connection to this dispute is the Defendant's current residence, a fact unrelated to either the alleged conduct or the claimed injury. Because that attenuated connection does not give New York a cognizable interest in governing the claims, New York law need not be considered. The analysis therefore proceeds by examining the claims under Minnesota and California law.

### A.    Actual Conflict Between Minnesota and California Law.

The Complaint asserts claims for Publication of Private Facts Invasion of Privacy and Unjust Enrichment based on the disclosure of private information.

Under Minnesota's choice-of-law rules, the threshold inquiry is whether the choice of one state's law over another would create an actual conflict that alters the outcome of the case. *See Jepson*, 513 N.W.2d at 469. "Where there is no true conflict, the law of the forum, in this case Minnesota, is applied." *Davis v. Outboard Marine Corp.*, 415 N.W.2d 719, 723 (Minn. Ct. App. 1987).

Here, the choice between Minnesota and California law is a distinction without a difference. As discussed below, the Plaintiff's claims for invasion of privacy and unjust enrichment are governed by legal standards in Minnesota and California that, while

articulated through different bodies of case law, are materially similar in the respects that matter to this case. Those shared principles ultimately lead to the same result under either jurisdiction.

### 1.   Publication of Private Facts.

Publication-of-private-facts claims are governed by substantively similar standards under Minnesota and California law. Both states have adopted the definition of the "Publication of Private Facts" tort from the Restatement (Second) of Torts, requiring the Plaintiff to prove that the publicized matter is (1) highly offensive to a reasonable person and (2) not of legitimate concern to the public (i.e., not newsworthy). *Compare Lake v. Wal-Mart Stores, Inc.*, 582 N.W.2d 231, 233 (Minn. 1998), *with Shulman v. Group W Prods., Inc.*, 18 Cal. 4th 200, 214 (Cal. 1998). Both states also recognize "legitimate public concern" as a complete bar to liability. *Shulman*, 18 Cal. 4th at 214; *Lake*, 582 N.W.2d at 233. Finally, both states have enacted substantially similar Anti-SLAPP statutes to protect individuals who speak out on matters of public concern with expedited resolution mechanisms and potential attorney's fees awards. *See* Minn. Stat. §§ 554.07–.20; Cal. Civ. Proc. Code § 425.16.

Against that backdrop, any remaining distinctions between Minnesota and California law are immaterial to the analysis here. Both jurisdictions apply substantively identical limitations on publication-of-private-facts claims, with liability categorically foreclosed where speech addresses a matter of legitimate public concern. The principal difference is not doctrinal, but experiential: California courts have developed a more extensive body of common-law precedent applying these principles in cases involving

celebrities and other public figures. That precedent does not reflect a different rule of law, but rather repeated applications of the same public-concern principles Minnesota has adopted.

### 2.    Unjust Enrichment.

The unjust enrichment theory asserted here is an equitable doctrine that is framed differently in Minnesota and California, but operates in substantially the same manner under both bodies of law. "To establish a claim for unjust enrichment under Minnesota law, the plaintiff must show that the defendant has knowingly received or obtained something of value for which the defendant in equity and good conscience should pay." *Schaaf v. Residential Funding Corp.*, 517 F.3d 544, 553–54 (8th Cir. 2008).

California frames unjust enrichment differently, but in a substantively similar way. California courts routinely state that there is "no cause of action for unjust enrichment," treating the concept instead as synonymous with restitution. *Bhikadiya v. Devani*, 2025 Cal. Super. LEXIS 43545, at *6 (Cal. Superior Ct. 2025); *see also Melchior v. New Line Prods., Inc.*, 106 Cal. App. 4th 779, 793 (Cal. Ct. App. 2003). California courts have gone on to state that "[c]ommon law principles of restitution require a party to return a benefit when the retention of such benefit would unjustly enrich the recipient." *City of Oakland v. Oakland Raiders*, 83 Cal. App. 5th 458, 477 (Cal. 2022). As such, despite the difference in terminology, the inquiry is substantially the same.

Both jurisdictions have the same limits to unjust enrichment to ensure it does not bypass legal rights or established remedies. First, the claim is strictly an equitable remedy available only when there is no adequate remedy at law. *See Ventura v. Kyle*, 825 F.3d

876, 887 (8th Cir. 2016); *see also Sepanossian v. Nat'l Ready Mixed Concrete Co.*, 97 Cal. App. 5th 192, 208 (Cal. 2023). In both states, the mere availability of a legal remedy—regardless of its ultimate success—bars equitable relief. *Id.*

Second, both states preclude an "unjust" finding where the defendant's conduct is legally protected. In Minnesota, unjust enrichment is only actionable when the challenged conduct "is not legally justifiable." *See Caldas v. Affordable Granite & Stone, Inc.*, 820 N.W.2d 826, 838 (Minn. 2012). California similarly denies restitution where it would frustrate law or public policy. See *Peterson v. Cellco P'ship*, 164 Cal. App. 4th 1583, 1595 (2008).

Because the differences between Minnesota and California law do not alter the analysis or outcome of the claim as applied to the facts alleged, no true conflict exists for purposes of Minnesota's choice-of-law inquiry. *See Jepson*, 513 N.W.2d at 469. In the absence of such a conflict, Minnesota law governs by default. *See Davis*, 415 N.W.2d at 723.

> **B.    Minnesota Law is Constitutionally Permissible and Favored Under the Five-Factor Analysis.**

Application of Minnesota law is constitutionally permissible given the substantial aggregation of contacts, including the parties' long-term residency in Minnesota and the fact that the challenged interview occurred here. *Jepson*, 513 N.W.2d at 469 (Minn. 1994). Minnesota's choice-of-law considerations likewise support application of forum law. The predictability-of-results factor favors Minnesota because the speech occurred here and concerned Minnesota-based events, while the remaining factors—maintenance

of interstate order, simplification of the judicial task, advancement of the forum's interest, and the better rule of law—are neutral given the materially similar privacy and free-speech frameworks applied by both jurisdictions. *Nw. Airlines, Inc. v. Astraea Aviation Servs., Inc.*, 111 F.3d 1386, 1394 (8th Cir. 1997); *Jepson*, 513 N.W.2d at 470–72.

In sum, Minnesota law applies because Minnesota and California law produce the same result on the facts alleged, and even if a conflict were assumed, Minnesota's constitutional contacts and the choice-influencing considerations favor application of forum law. Accordingly, the Court should analyze the claims under Minnesota law, informed where appropriate by California decisions addressing analogous public-figure and public concern issues.

## **ARGUMENT**

I.    **THE COMPLAINT FAILS TO STATE A CLAIM FOR INVASION OF PRIVACY.**

A.    **Minnesota's Invasion-of-Privacy Doctrine is a Narrow Exception to the First Amendment that Should not be Expanded.**

A federal court sitting in diversity is precluded from creating or extending state tort law beyond the contours expressly recognized by the state's supreme court. *See Salier v. Walmart, Inc.*, 76 F.4th 796, 801 (8th Cir. 2023). Where the state's highest court has not addressed a particular theory of liability, the federal court's role is not to create or expand state law, but solely "to predict, to the best of our ability, how that Court would rule." *Id.* Consistent with that strict jurisdictional constraint, the Eighth Circuit has made

clear that diversity jurisdiction may not be used as a vehicle to obtain recognition of a "sweeping new right" that the Minnesota Supreme Court has not adopted. *Id.* at 801.

These limits are especially salient in cases implicating speech. The United States Supreme Court has long recognized that the First Amendment imposes constitutional protections applicable to those torts of invasion of privacy that involve publicity. *Cox Broad. Corp. v. Cohn*, 420 U.S. 469, 489 (1975). As a result, liability for truthful speech is the exception, not the rule. Speech on matters of public concern "occupies the highest rung of the hierarchy of First Amendment values" and receives special protection against state-law tort liability. *Snyder v. Phelps*, 562 U.S. 443, 452 (2011) (quoting *Connick v. Myers*, 461 U.S. 138, 145 (1983)).

Against this doctrinal and constitutional backdrop, any expansion of Minnesota's invasion-of-privacy doctrine by a federal court must be approached with restraint.

The Minnesota Supreme Court first recognized the tort of publication of private facts in *Lake*, 582 N.W.2d 231. In doing so, the court adopted the Restatement (Second) of Torts formulation and emphasized that liability would attach only where a plaintiff pleads and proves each of four strictly defined elements: (1) publicity; (2) concerning the private life of another; (3) that would be highly offensive to a reasonable person; and (4) that is not of legitimate concern to the public. *Id.* at 235.

The *Lake* court's recognition of this cause of action was expressly shaped by constitutional concerns. The court acknowledged the inherent tension between privacy torts and the First Amendment. *Id.* at 235–36. In particular, the court declined to recognize the related tort of false light, concluding that its adoption would "unacceptably

increase[e] the tension" with constitutional free-speech protections and risk imposing liability for truthful expression. *Id.* at 235. The Minnesota Supreme Court thus made clear that any expansion of privacy-based liability beyond the precise Restatement framework would be constitutionally suspect.

The Minnesota Supreme Court reinforced that narrow construction in *Bodah v. Lakeville Motor Express, Inc.*, 663 N.W.2d 550 (Minn. 2003). There, the Court, in upholding the trial court's dismissal of the plaintiff's publication of private facts claim on a motion to dismiss, described the cause of action as occupying a "very narrow gap in tort law." *Id.* at 558.

Taken together, *Salier*, *Lake*, and *Bodah* establish a clear and binding framework for this Court's analysis. Applied to the allegations in this case, and as discussed in detail below, Plaintiff's attempt to impose liability for truthful autobiographical speech concerning sexual trauma and the dissolution of a celebrity marriage would require extending Minnesota's invasion-of-privacy doctrine beyond its narrow, constitutionally cabined boundaries and recognizing the kind of "sweeping new right" that *Salier* expressly prohibits.

### B. Defendant's Statements about Plaintiff Related to a Matter of Public Concern.

This motion largely turns on whether the speech at issue in the case at bar addressed a matter of legitimate public concern. If it did, the invasion-of-privacy claim fails as a matter of law. *See Lake*, 582 N.W.2d at 235.

The Minnesota Supreme Court recently clarified that whether speech addresses a matter of public concern is a question of law determined by the totality of its content, form, and context, with no single factor controlling. *Johnson v. Freborg*, 995 N.W.2d 374, 383 (Minn. 2023). In articulating this standard, the Court relied heavily on *Snyder v. Phelps*, a case which made clear that the "arguably inappropriate or controversial character of a statement" is irrelevant to the public-concern inquiry because allowing liability to turn on a jury's reaction to perceived outrageousness would punish speakers based on subjective moral judgments and chill protected expression. *Snyder*, 562 U.S. 443 at 453, 458. Following this framework, *Freborg* held that the public-concern inquiry must focus on the "overall thrust and dominant theme" of the communication as a whole, rather than on isolated fragments that may be seen as offensive. *Freborg*, 995 N.W.2d at 387 (Minn. 2023).[3]

It is also noteworthy that, although *Freborg* was decided only two years ago, the Minnesota Legislature has already enacted new legislation echoing *Freborg*'s core principle that speech on matters of public concern is to be protected, with tort claims targeting protected speech to be resolved early and as a matter of law. Specifically, in 2024, the Legislature enacted the Uniform Public Expression Protection Act (UPEPA), codified at Minn. Stat. §§ 554.07–554.20. The Act was enacted in direct response to

---

[3] Applying this standard, the *Freborg* court held as a matter of law that speech posted on social media—consisting of a defendant's autobiographical recounting of a traumatic sexual experience—addressed a matter of public concern. *Id.* at 381–82, 391.

*Leiendecker v. Asian Women United of Minnesota*, which invalidated Minnesota's prior, narrower anti-SLAPP statute on procedural grounds. 895 N.W.2d 623 (Minn. 2017).

The UPEPA represents an explicit and undeniable acknowledgment of Minnesota's commitment to protecting speech. Whereas the prior statute was limited to "public participation" aimed at procuring government action, the new law protects the exercise of First Amendment rights on any "matter of public concern." Minn. Stat. § 554.08(b)(3). The Legislature expressly directed that the Act "must be broadly construed and applied" to safeguard the exercise of free speech and press rights. Minn. Stat. § 554.17.

Consistent with that directive, the UPEPA reflects a clear legislative judgment that public-concern determinations are to be made early in the litigation upon a motion to dismiss. See Minn. Stat. §§ 554.09 (special motion for expedited relief), 554.11 (prompt hearing), 554.13(a) (mandatory dismissal where claim lacks legal merit). Although the UPEPA is less than two years old, its validity and operative framework have already been acknowledged in a published decision of the Minnesota Court of Appeals, which explicitly echoed *Freborg*'s articulation of the public-concern inquiry. *See J&D Dental v. Liya Hou*, 26 N.W.3d 491, 498 (Minn. App. 2025).

To be clear, this case is not before the Court on a UPEPA motion given that federal courts have recognized that certain procedural mechanisms of state anti-SLAPP statutes may not apply in federal court. *See Unity Healthcare, Inc. v. County of Hennepin*, No. 14-114 (JNE/JJK), 2015 U.S. Dist. LEXIS 186170, at *2 (D. Minn. Sept. 16, 2015). That procedural limitation, however, does not diminish the UPEPA's relevance as a

definitive expression of Minnesota's substantive policy judgment regarding claims targeting speech on matters of public concern. See *Harrington v. Hall County Board of Supervisors*, No. 4:15-CV-3052, 2016 U.S. Dist. LEXIS 43541, at *16–18 (D. Neb. Mar. 31, 2016).

With this legal framework in place, the speech at issue in the case at bar must be evaluated under the Freborg standard—considering content, form, and context—and in light of analogous decisions from other jurisdictions. As shown below, application of that framework compels the conclusion that the challenged speech addressed a matter of legitimate public concern as a matter of law.

> 1.    **The Freborg Test Supports a Finding that Speech at Issue Involved a Matter of Public Concern.**
>
> i.    **The Content of the Speech Related to a Matter of Public Concern.**

Under *Freborg*, "speech deals with matters of public concern when it can be fairly considered as relating to any matter of political, social, or other concern to the community, or when it is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public." *Freborg*, 995 N.W.2d at 387–88 (quoting *Snyder*, 562 U.S. at 453). Viewed in its entirety, rather than as isolated snippets, the content of Defendant's speech clearly met this definition by providing a poignant discussion of love, loss, and sexual trauma that led to the unfortunate end of an otherwise happy celebrity marriage.

Throughout the long-form interview, the Defendant repeatedly praised the Plaintiff's character, unequivocally describing him as "the greatest guy in the world" and

"a really good guy" Tr. at 14:10–14. She portrayed their seven-year union as exceptionally harmonious, noting they "never fought" and "never yelled at each other a single time during [their] whole marriage," *Id.* at 14:6–8, further stating she felt "really lucky" to have been with him *Id.* at 14:11. However, the Defendant shared that this deep emotional connection was hindered by a severe anatomical incompatibility that made sexual intercourse "impossible" and left her "in tears" *Id.* at 10:25–11:2. To illustrate the severity of that physical mismatch, Defendant described Plaintiff's genitals as being the size of two or three Coke cans and explaining that it was likely in the top 0.01% of the population in terms of size. *Id.* 18:22-23.

The narrative further detailed the "desperate, years-long efforts" the couple undertook to overcome this physical barrier. *Id.* 9:11. Defendant recounted consulting "therapists [and] doctors," *Id.* 9:12–13, and researching potential "surgical interventions," including "lipo-type" procedures. Tr. 9:15–16. Despite these efforts, the physical reality made the relationship unsustainable as a marriage, leading them to become "homies" rather than spouses. *Id.* 10:6.

The Complaint, however, ignores the dominant theme of the speech and instead attempts to isolate the narrow subset of statements concerning the size of Plaintiff's genitalia, asserting that those remarks were offensive and treating them as though they constituted the entirety of what was communicated. *Freborg* forecloses that approach, because a court must assess the overall thrust and dominant theme of the speech as a whole and may not consider the arguably inappropriate or controversial character of

isolated statements in determining whether the speech addresses a matter of public concern. *See Freborg*, 995 N.W.2d at 387–89.

Because the overall thrust of Defendant's speech relates to a subject of legitimate news and general interest, the content factor weighs in favor of a public concern finding.

### ii. The Form of the Speech Supports a Finding of Public Concern.

Under *Freborg*, the "form" inquiry considers where the speech occurred and how it was communicated. *Freborg*, 995 N.W.2d at 389. There, the Court explained that the "vast democratic forums of the Internet, and social media in particular, constitute the most important places . . . for the exchange of views" in modern society. *Id.* at 389 (quoting *Packingham v. North Carolina*, 582 U.S. 98, 104 (2017)). Speech delivered through such digital platforms functions like that of a "town crier with a voice that resonates farther than it could from any soapbox." *Id.* (quoting *Reno v. ACLU*, 521 U.S. 844 (1997)). Accordingly, the choice to speak through a modern public square reflects an intent to reach a broad public audience, a consideration that weighs in favor of a public-concern finding.

In the case at bar, the challenged speech was broadcast via a public livestream on Twitch and subsequently uploaded to a publicly accessible YouTube channel. Compl. ¶¶ 26–29. By disseminating her remarks through these expansive platforms, Defendant chose precisely the type of forum that *Freborg* identifies as indicative of speech addressing matters of public concern. This method of dissemination—aimed at a vast,

public audience rather than a small class of private recipients—confirms that the form of the speech supports classification as a matter of legitimate public concern.

### iii. The Context of the Speech Shows that it Involves a Matter of Public Concern.

Under *Freborg*, the "context" inquiry focuses on the broader social framework in which the speech occurred. *Freborg*, 995 N.W.2d at 390. In evaluating this factor, courts look beyond the content of the speech itself to determine whether it connects to a wider social conversation. *Id.* Relevant considerations include the public discussion generated by the speech, its connection to a broader cultural or social movement, and whether it was disseminated through news media. *Id.* at 390–92. The context here satisfies each of these indicia.

First, the challenged speech occurred during a public livestream interview addressing the dissolution of a high-profile marriage between two individuals who were prominent public figures at the time of the events discussed. Compl. ¶¶ 11-12. The subject matter—the reason for the end of a widely followed celebrity marriage—was itself a topic of intense public interest long before the interview occurred.

Second, as *Freborg* notes, the "dissemination of statements in the news media" is a good indication of the public's interest. *Freborg*, 995 N.W.2d 374 at 392. Here, the speech immediately generated extensive public discussion well beyond the parties themselves. As the Complaint expressly alleges, the interview triggered widespread national and international media coverage across numerous major platforms. Compl. ¶¶ 41–44.  These media reports, in turn, have resulted in extensive discussion and comments

19

from the general public. *Id.* ¶¶ 46-50.  This resulting discourse—spanning entertainment media and global social media commentary—squarely points to the speech being a matter of public concern.

Third, the speech fits within a broader social conversation regarding sexual trauma, autobiographical truth, and the realities of celebrity relationships. As discussed in detail below, courts across the country recognize that such topics contribute to the public understanding of common human experiences and are not confined to a purely private grievance.

Because Defendant's speech generated substantial public discussion, was widely disseminated through news media, and connected to broader social issues, the context factor weighs in favor of a public-concern finding.

> **iv.    The Freborg Factors, in the Aggregate, Strongly Support the Notion that Defendant's Speech Involved a Matter of Public Concern.**

Considered as a whole, the undisputed record confirms that the challenged speech falls squarely within the category of expression Minnesota law protects as being a matter of public concern. The dominant theme of the speech, the manner in which it was disseminated, and the broader public discourse it generated all align with the framework articulated in *Freborg* and reinforced by the UPEPA. Under that governing law, the speech is constitutionally protected, and Plaintiff's invasion-of-privacy claim must be dismissed.

### 2.    The Courts in Other Jurisdictions Have Found Speech on Similar Topics to Constitute Matters of Public Concern.

Although Minnesota law resolves the issue presented here, it is instructive and helpful to consider how courts in other jurisdictions have addressed invasion-of-privacy claims involving fact patterns closely aligned with those present in the case at bar. As set forth below, courts nationwide have consistently held that speech concerning celebrity relationships, and autobiographical depictions of sexual trauma, constitutes a matter of legitimate public concern.

### i.    Relationships Involving at Least One Celebrity Are Inherently Matters of Public Concern.

Courts have long recognized that the romantic relationships of celebrities fall within the scope of matters of public concern, rather than purely private affairs. That principle applies with equal force to the partners of public figures, who, by virtue of the relationship, enter the public concern. *Carlisle v. Fawcett Publ'ns, Inc.*, 201 Cal. App. 2d 733, 747 (Cal. Ct. App. 1962).

The California Court of Appeal established the foundational rule regarding the relationships of celebrities in *Carlisle v. Fawcett Publications, Inc. Id.* In *Carlisle*, the plaintiff—a private individual—sued a movie magazine for invasion of privacy after it published a detailed account of his teenage marriage to actress Janet Leigh. *Id.* at 736–39. The article, titled "Janet Leigh's Own Story—'I Was a Child Bride at 14!'", recounted events that had occurred nearly twenty years prior. *Id.* at 736.

Despite the plaintiff's status as a private citizen and the intimate nature of the details, the court found no actionable invasion of privacy. *Id.* at 736–37, 748. The court

reasoned that there is a distinct "public interest which attaches to people who by their accomplishments, mode of living, professional standing or calling, create a legitimate and widespread attention to their activities." *Id.* at 746.

Consequently, the court held as a matter of law on a demurrer that public figures "have to some extent lost the right of privacy," and it is "proper to go further in dealing with their lives and public activities than with those of entirely private persons." *Id.* at 747. Crucially, *Carlisle* extended this diminished expectation of privacy to the romantic partners of famous individuals:

> A necessary corollary is that people closely related to such public figures in their activities must also to some extent lose their right to the privacy that one unconnected with the famous or notorious would have.

*Id.*

The Fifth Circuit Court of Appeals also applied this same principle to facts strikingly similar to the case at bar in *Brewer v. Memphis Publishing Co.*, 626 F.2d 1238 (5th Cir. 1980). There, the plaintiffs were Anita Wood Brewer, an entertainer and former girlfriend of Elvis Presley, and her husband John Brewer, a former football star. *Id.* at 1240. The defendant newspaper published a column falsely implying that Anita had met with Presley for a "reunion" in Las Vegas and was divorced from John. *Id.* Although Anita had retired from entertainment eight years prior and John had retired from football, the court held as a matter of law that they remained public figures regarding the subject matter of the article. *Id.* at 1257.

The court reasoned that because Anita's fame was derived in part from her relationship with Presley, she remained a public figure for stories relating to that

relationship, regardless of the passage of time. *Id.* The court concluded that even where a story concerns private romantic history, the First Amendment protects the press's right to cover the relationships of those who have attained public prominence. *Id.* at 1257–58.

This core principle has been reaffirmed in subsequent decades, even where the "facts" disclosed are alleged to be sensational or false. In *Eastwood v. Superior Court*, the court addressed a claim by actor Clint Eastwood regarding a National Enquirer article detailing a purported "love triangle" involving him, singer Tanya Tucker, and actress Sondra Locke. 149 Cal. App. 3d 409, 414 (Cal. 1983). The article alleged specific romantic behaviors, claiming that Eastwood was swept off his feet by Tucker, that they publicly cuddled and publicly kissed and hugged, and that his other partner, Locke, had camped at his doorstep and begged Eastwood to 'keep her. *Id.* at 414-15.

Although the court permitted the case to proceed based on allegations of falsity, it held as a matter of law that the subject matter itself—Eastwood's romantic life—was indisputably a matter of public concern. *Id.* at 423. The court stated:

> We have no doubt that the subject of the Enquirer article—the purported romantic involvements of Eastwood with other celebrities—is a matter of public concern, which would generally preclude the imposition of liability[.]

*Id.* (citing *Carlisle*, 201 Cal. App. 2d at 746–47).

Federal courts applying these standards have reached the same conclusion, resolving the inquiry at summary judgment even where the speech involves highly intimate sexual details. In *Michaels v. Internet Entertainment Group, Inc.*, the court granted summary judgment on an invasion-of-privacy claim brought by actress Pamela Anderson Lee against Hard Copy regarding the broadcast of excerpts from a private sex

tape. 48 U.S.P.Q.2D 1891 (C.D. Cal. 1998). The broadcast included clips of the couple "in lingerie" and engaged "in some kind of sex act." *Id.* at *36.

Lee argued that these depictions were purely private, but the court squarely rejected the argument that the plaintiff's sexual relationships were outside the scope of public interest, stating:

> It is clearly established that the romantic connections of celebrities are newsworthy.

*Id.* at *13.

The *Michaels* court emphasized that public concern is "defined broadly to include not only matters of public policy, but any matter of public concern, including the accomplishments, everyday lives, and romantic involvements of famous people." *Id.* at *19. Because the plaintiff was a voluntary public figure, the court found that even speech revealing private facts about her sexual activities bore a "substantial nexus" to a matter of legitimate public interest—namely, her relationship and the dispute over the tape itself. *Id.* at *25.

Under this unbroken line of authority, the marriage and relationship between the Defendant and Plaintiff—both of whom were public figures at the time of the underlying events disclosed by Defendant—are matters of legitimate public concern. By entering the public arena, Plaintiff rendered his romantic relationships a legitimate subject of public discourse.

ii.     **Public-Figure Status Does Not "Fade" Regarding Events That Occurred During the Period of Prominence.**

As discussed above, courts have consistently recognized that an individual's status as a public figure bears directly on the public concern analysis. The Complaint nevertheless asserts that Plaintiff "quickly and quietly receded from the public eye" following his retirement from the NFL in 2019, and contends that this withdrawal restored his privacy rights and insulated him from public commentary. Compl. ¶¶ 1, 14.

Courts, however, have repeatedly rejected the notion that public-figure status expires for speech addressing past public conduct or relationships. A later withdrawal from public life does not retroactively transform such events into private facts; the relevant inquiry is whether the speech concerns events that occurred while the individual was a public figure. *See, e.g.*, *Time, Inc. v. Johnston*, 448 F.2d 378, 381 (4th Cir. 1971).

The Fourth Circuit established this "no rule of repose" doctrine in *Time, Inc. v. Johnston*. *Id.* There, a former professional basketball player sued for libel regarding an article describing events from his playing days, published nine years after his retirement. *Id.* at 379. Affirming the grant of summary judgment against him, the court held that his retirement did not restore his privacy regarding his past career. *Id.* at 381. The court reasoned that "[n]o rule of repose exists to inhibit speech relating to the public career of a public figure so long as newsworthiness and public interest attaches to events in such public career." *Id.*

*Johnston* relied on the snail in the shell doctrine articulated in *Cohen v. Marx*, 94 Cal. App. 2d 704 (Cal. 1949). In *Cohen*, the court held that a boxer who had retired ten

years prior could not "draw himself like a snail into his shell" to avoid commentary on his past activities. *Id.* at 705. The court ruled that once an individual seeks "publicity and the adulation of the public," he waives his right of privacy regarding that era and cannot later "rescind his waiver" to suppress truthful commentary about his life during that period. *Id.*

As discussed above, the Fifth Circuit applied this exact principle in *Brewer v. Memphis Publishing Co.* to a former football player and his wife, an entertainer. *Brewer*, 626 F.2d at 1257. Reversing a jury verdict for the plaintiffs, the court held that they remained public figures as a matter of law regarding their past relationship and careers, years after both had retired to a private life. *Id.* at 1257–58. The court found that because the speech related to the very things that made them famous—their careers and their relationship—the public interest did not fade with time. *Id.*

In the case at bar, the "public concern" is rooted in the time period when the Plaintiff was an active NFL star and the parties were a high-profile couple. The speech at issue relates exclusively to the events of that public career and marriage. Under *Johnston*, *Cohen*, and *Brewer*, the Plaintiff cannot claim privacy *now* for events that occurred *then*, when he was voluntarily "exposed to the public eye" and seeking the public's attention.

### iii.   Autobiographical Speech Regarding Sexual Trauma and Medical Health Is a Matter of Public Concern.

The subject matter of the Defendant's speech—an autobiographical account of sexual pain, medical struggle, and the disintegration of a relationship—is itself a matter of legitimate public concern even apart from the public figure status of the parties. Courts recognize that personal sexual trauma and medical diagnoses are not merely private when

they explain human experience. Rather, autobiographical accounts of health struggles—even those involving intimate details of sexual dysfunction—are matters of legitimate public concern because they contribute to public discourse on important human issues. *Bonome v. Kaysen*, No. 03-2767, 2004 Mass.Super.LEXIS 172 (Mass. Super. Ct. Mar. 3, 2004).

The Superior Court of Massachusetts addressed this precise issue in *Bonome v. Kaysen*. There, the plaintiff sued his former girlfriend, author Susanna Kaysen, for invasion of privacy after she published a memoir detailing her own "severe vaginal pain" and the resulting sexual dysfunction in their relationship. *Id.* at *2. Much like the Plaintiff here, Bonome argued that the book disclosed intimate anatomical and behavioral details about him that were private and offensive. *Id.*

Resolving the claim on a motion to dismiss, the court rejected the plaintiff's argument and dismissed the privacy counts as a matter of law. *Id.* The court explicitly found that the broader topics of undiagnosed physical conditions and their impact on relationships are matters of legitimate public concern. *Id.* While the narrative included graphic details regarding the couple's sexual life, the court held that these details were protected because they were "included to develop and explore those themes" rather than for morbid and sensational prying. *Id.* at *18.

Crucially, the *Bonome* court recognized that an author often cannot discuss her own medical and sexual history without disclosing a partner's involvement. The court reasoned:

> Because the First Amendment protects Kaysen's ability to contribute her own personal experiences to the public discourse on important and legitimate issues of public concern, disclosing Bonome's involvement in those experiences is a necessary incident thereto.

*Id.* at 19-20.

This reasoning applies with equal force in the case at bar. The Defendant's speech was not a gratuitous exposé; it was a truthful explanation of her own medical journey and the reasons her marriage ended. Just as *Bonome* held that vaginal pain and sexual dysfunction are matters of public concern, this Court should recognize that the Defendant's truthful account of her own sexual trauma and anatomical incompatibilities contributes to the public understanding of these important and legitimate issues. To hold otherwise would improperly restrict a speaker's ability to recount her own life experiences where those experiences necessarily involve another person, a result the Bonome court squarely rejected.

### iv. Truthful Disclosure of Family Sexual Trauma Is of Public Concern, Even If It Causes Pain.

Just as courts have protected autobiographical speech regarding medical health, they have similarly held that truthful disclosures of family trauma and relationship breakdowns are matters of legitimate public concern—even when those disclosures cause significant pain to the individuals involved. *See Anonsen v. Donahue*, 857 S.W.2d 700 (Tex. App. 1993).

The Texas Court of Appeals addressed this balance in *Anonsen v. Donahue*. In that case, the plaintiff sued her own daughter and a talk show host for invasion of privacy after the daughter revealed on national television that she had been a victim of incest and

rape within the family. *Id.* at 701–02. The plaintiff argued that these revelations were deeply private, shameful, and damaging to the family's reputation. *Id.*

Affirming the trial court's grant of summary judgment in favor of the defendants, the appellate court held that the speech was protected as a matter of legitimate public concern. *Id.* at 706. The court reasoned that "freedom of discussion... must embrace all issues about which information is needed or appropriate to enable the members of society to cope with the exigencies of their period." *Id.* at 703-704 (quoting *Time, Inc. v. Hill*, 385 U.S. 374, 388 (1967)).

The court explicitly ruled that the public has a legitimate interest in understanding family dynamics and trauma through truthful and undisguised accounts. *Id.* at 706. While acknowledging the emotional suffering and pain the disclosure caused the mother, the court held that the "protection of [the daughter's] right to reveal her story" regarding these topics was paramount. *Id.* at 706.

In the case at bar, the Complaint is premised on the notion that the details of the marriage's end are too intimate for public consumption. However, *Anonsen* demonstrates that even the most sensitive family secrets are matters of public concern when they form part of a truthful autobiography. The public interest in understanding the reality of the Plaintiff and Defendant's relationship—and the sexual issues that ended it—overrides the Plaintiff's desire for silence. As in *Anonsen*, the Defendant has a right to tell her own story, even if that story is painful for the Plaintiff to hear.

### C.    State Tort Law Cannot Bypass First Amendment Protections for Public Figures.

The legitimate public concern analysis discussed above is not merely a matter of state common law; it is compelled by the First Amendment itself. The Supreme Court has made clear that public figures may not evade constitutional protections for speech by repackaging defamation-style grievances as other state-law torts. *Hustler Magazine v. Falwell*, 485 U.S. 46, 56 (1988).

In *Hustler Magazine v. Falwell*, the Court held that public figures and public officials may not recover on tort claims without satisfying the First Amendment's protections for speech about public figures. *Id.* The Court explained that public discourse would be imperiled if state tort law could be used to punish speech concerning public figures merely because it is offensive or emotionally distressing. *Id.* at 51–52. Allowing liability under such inherently subjective tort theories, the Court warned, would permit plaintiffs to silence disfavored speech through artful pleading rather than constitutional scrutiny. *Id.* at 52–53.

The principle articulated in *Hustler* applies with equal force here. State-law privacy doctrines cannot be construed in a manner that allows public figures to punish truthful speech about matters of public interest simply by invoking a different tort label. Accordingly, the legitimate public concern limitation on publication-of-private-facts claims must be interpreted broadly when applied to public figures to avoid impermissible infringement on protected expression.

**D.     Defendant's Speech Falls Squarely Within the Established Scope of Legitimate Public Concern.**

Minnesota law has never permitted an invasion-of-privacy claim to proceed in anything approaching this constellation of facts. To the contrary, the Minnesota Supreme Court has emphasized that publication-of-private-facts liability occupies only a "very narrow gap" in tort law. *Bodah*, 663 N.W.2d at 558.

Under the unified framework articulated in *Freborg*, courts must independently examine the whole record and assess the overall thrust and dominant theme of the speech, without parsing isolated remarks or weighing alleged offensiveness. 995 N.W.2d at 387–89. When that framework is applied here, the challenged disclosure falls squarely within the sphere of legitimate public concern as a matter of law. The speech's dominant theme was not humiliation or sensationalism, but a candid, personal account of sexual trauma that led to the end of a relationship involving two public figures—precisely the type of expression Minnesota courts have cautioned against chilling through expansive tort liability.

As discussed above, Courts in other jurisdictions, applying the same First Amendment principles Minnesota has embraced, have consistently reached the same conclusion in analogous circumstances. Truthful autobiographical speech, discussion of painful sexual or medical realities, and explanation of the relationships of public figures have each been recognized as constitutionally protected matters of public concern. Those decisions do not expand Minnesota law; they confirm the constitutional boundary Minnesota courts have already drawn.

Allowing this action to proceed would therefore require a sweeping expansion of Minnesota's privacy doctrine—one far beyond anything contemplated when the tort was first recognized in *Lake*, 582 N.W.2d at 235. It would convert a doctrine designed to address a narrow class of harmful disclosures into a broad mechanism for silencing public figures who speak truthfully about their own lives. That result would directly contradict *Bodah*'s insistence on restraint and collide with the First Amendment limits reaffirmed in *Freborg*.

A federal court sitting in diversity is not permitted to take that step. Its role is to apply Minnesota law as it exists—not to create new liability Minnesota courts have never recognized. *Salier*, 76 F.4th at 801–02. Because Minnesota law has never penalized this combination of truthful, autobiographical speech touching on matters of public concern— and because the Constitution independently forbids such an expansion—the invasion of privacy claim must be dismissed as a matter of law.

## II.   THE UNJUST-ENRICHMENT CLAIM FAILS AS A MATTER OF LAW

### A.   The Unjust Enrichment Claim is Barred by Either the Lawfulness of the Speech or the Existence of a Legal Remedy.

Plaintiff's equitable claim for unjust enrichment fails as a matter of law because it is asserted in tandem with a tort claim for invasion of privacy based on the same conduct. As discussed below, if the invasion of privacy claim fails, there is no unlawful conduct to support unjust enrichment; if it succeeds, the equitable claim is barred by the availability of an adequate remedy at law. In either case, dismissal is required.

Minnesota law defines unjust enrichment as requiring conduct that is "not legally justifiable." *Caldas* 820 N.W.2d at 838. Thus, if the Defendant's speech is truthful and addresses a matter of legitimate public concern, her conduct in sharing her own life experiences constitutes a protected exercise of First Amendment rights. Because the exercise of a constitutional right is, under any reasonable definition, "legally justifiable" conduct, the Plaintiff cannot, as a matter of law, establish the "unjust" element required to sustain an unjust-enrichment claim.

The unjust-enrichment claim also fails under the alternative premise that the invasion-of-privacy claim is viable because unjust enrichment is an equitable remedy available only where no adequate remedy at law exists. *ServiceMaster of St. Cloud v. GAB Bus. Servs., Inc.*, 544 N.W.2d 302, 305 (Minn. 1996).

The Eighth Circuit has squarely applied this rule in the context of expressive works. In *Ventura v. Kyle*, the court reversed an unjust-enrichment judgment because the plaintiff's invasion-of-privacy claim constituted an adequate remedy at law. 825 F.3d 876, 887 (8th Cir. 2016).

The Plaintiff therefore cannot escape this convergence of authority. On one prong, if the invasion-of-privacy claim fails because the speech is constitutionally protected, the Defendant's conduct was legally justifiable, which forecloses any finding that the alleged enrichment was "unjust." On the other prong, if Plaintiff's invasion-of-privacy claim is viable, the unjust-enrichment claim is barred because that claim itself provides an adequate remedy at law. Under either scenario, the unjust-enrichment claim fails as a matter of law and must be dismissed.

33

### B.    The Unjust Enrichment Claim Fails Because the Plaintiff Never Conferred a Benefit on Defendant.

Under Minnesota law, a claim for unjust enrichment requires that the plaintiff conferred a benefit upon the defendant. *Ventura*, 825 F.3d at 887. A plaintiff does not confer a benefit in the legal sense merely by being the subject of another person's expressive work. *Id.*

The Eighth Circuit's decision in *Ventura* is binding authority on this precise issue. *Id*. There, the court squarely rejected the theory that a celebrity confers a benefit on an author "by [his] mere existence as a colorful figure who might inspire people to make up stories about him." *Id.* The court explained that such a relationship—where one party merely serves as the inspiration or subject of another's creative expression—does not give rise to the quasi-contractual relationship required for unjust-enrichment liability. *Id.* Because the plaintiff had not performed a service or provided any tangible benefit to the defendant, the Eighth Circuit reversed the district court's denial of judgment as a matter of law and vacated the jury's verdict. *Id.*

That rule controls in the case at bar. The Plaintiff did not perform a service for the Defendant, nor did he confer a benefit upon her. He merely existed as part of the Defendant's life history. Accordingly, the Plaintiff's unjust-enrichment claim fails at the threshold because no benefit was conferred as a matter of law.

## <u>CONCLUSION</u>

The First Amendment protects truthful autobiographical speech, speech describing sexual trauma, and speech about the relationships of public figures. No Minnesota court

has ever permitted an invasion-of-privacy or unjust-enrichment claim to proceed when any—let alone all—of those factors are present. Allowing this action to go forward would therefore require far and away the most sweeping expansion of Minnesota's invasion-of-privacy doctrine since the Minnesota Supreme Court first recognized the tort over 25 years ago, and would do so in direct conflict with bedrock First Amendment principles. That is not a step a federal court sitting in diversity should take. The motion to dismiss should be granted.

**RESPECTFULLY SUBMITTED,**

Dated:  January 23, 2026

Matthew J. Bialick, Esq. (#0389088)
Karl J. Johnson, Esq. (#391211)
3701 Shoreline Drive, Ste 200A
Wayzata, Minnesota, 55391
Phone: 952-239-3095
Email: matthew@mjblawmn.com

**ATTORNEYS FOR DEFENDANT**