UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

| | | |
|---|---|---|
| Matthew Kalil, | ) | File No. 26-CV-62 (PJS/DTS) |
| Plaintiff, | ) | |
| vs. | ) | Minneapolis, Minnesota |
| | ) | April 29, 2026 |
| Haley Kalil, | ) | 8:32 a.m. |
| Defendant. | ) | |

---

BEFORE THE HONORABLE PATRICK J. SCHILTZ
UNITED STATES DISTRICT COURT JUDGE

**(MOTION HEARING)**

APPEARANCES

For the Plaintiff: Rosen Saba LLP
RYAN D. SABA, ESQ.
2301 Rosecrans Avenue
Suite 3180
El Segundo, CA 90245

For the Defendant: MJB Law Firm PLLC
MATTHEW J. BIALICK, ESQ.
3701 Shoreline Dr, Ste 200a
Wayzata, MN 55391

Court Reporter: JANELL M. GRUBER, RMR, CRR, CRC
United States District Courthouse
300 South Fourth Street, Box 1005
Minneapolis, MN 55415

**REPORTER'S NOTE:** *All quotations are reflected in the manner in which they were read into the record and do not necessarily indicate an exact quote from the document.*

Proceedings reported by certified stenographer; transcript produced with computer.

**P R O C E E D I N G S**

**IN OPEN COURT**

THE COURT: We are here today on the case of Matthew Kalil versus Haley Kalil. The case is civil number 26-0062.

If I could have the attorneys make their appearances, please.

MR. SABA: Good morning, Your Honor. My name is Ryan Saba of Rosen Saba on behalf of the plaintiff, Matthew Kalil.

THE COURT: Good morning.

MR. BIALICK: Good morning. Matthew Bialick on behalf of Defendant Haley Kalil.

THE COURT: And good morning to both of you.

So Mr. Bialick, it's your motion. Could I have you at the podium, please?

MR. BIALICK: Certainly, Your Honor.

THE COURT: And just let me know when you're ready to go there.

MR. BIALICK: I am ready.

THE COURT: All right. So I've read the briefs, and I watched the -- I watched the YouTube video, not the whole thing, but the ten minutes or so, which I'm sure really confused my YouTube algorithm in a sense. Not my

normal -- normal venue.

Let me just start by asking you this. I -- you raise the First Amendment on and off in your briefs. If -- if -- just -- I'm not asking you to agree to this, but if hypothetically speaking this speech was -- was a tort, was a, you know, publication of private facts, would there be a First Amendment problem nonetheless?

MR. BIALICK: Yes.

THE COURT: In other words, what's the gap between the First Amendment and the elements of the tort?

MR. BIALICK: Certainly, Your Honor. A couple responses to that. First of all, the First Amendment shaped the very cause of action that we're talking about here in the *Lake v. Wal-Mart* case. So any type of forcing out of the borders of this tort is going to necessarily be constitutionally suspect.

Even the Minnesota Supreme Court has realized that this is -- this is an exception. In the *Bodah* case, they specifically talked about being a narrow gap in tort law. So it's not just the facial elements that are at issue here --

THE COURT: Sure.

MR. BIALICK: -- it's the application and the fact pattern.

THE COURT: But all *Lake* does is say we're going

to recognize the restatement elements.

MR. BIALICK: But apart -- so that's my first response.

The second response is that there's case law, such as the *Bonome* case, which talk about this additional issue with respect to the First Amendment, which is autobiographical speech. It goes beyond that, talking about the right to tell your own story about your own life about your own body.

If you see in the analysis that case basically put forward, they were talking about things almost on two tracks. One was just the public concern element just, you know, from almost a restatement. They cited to the restatement type of approach. And the other thing that they looked at was they veered into the second thing, which is the right to tell your own story about your own body.

And so based on that, I would argue that the First Amendment applies even apart from how it shapes the tort at issue.

THE COURT: Well, if -- so your view -- there's no question the First Amendment applies. I mean, obviously it applies. It's the First Amendment.

But -- so if we had speech where -- let's just say for -- for -- if it's okay, I'm just going to refer to "Matt" and "Haley," just to --

MR. BIALICK: Certainly.

THE COURT: So -- so if Haley had given publicity to a matter concerning the private life of Matt, and the matter -- she did so in a way that was highly offensive to reasonable people, and it was not of legitimate concern to the public, your view is that even if it's highly offensive, even if it's not of legitimate concern to the public, as long as she's talking about herself, even if in talking about herself she's disclosing things about others that the First Amendment would protect that?

MR. BIALICK: No, Your Honor. I do think that there are limits to that.

I think what you're talking about is not just, I'm happening to talk about myself. It's that you're talking about intimate portions of your own life. And that's one of the things that the *Anonsen* case, that the *Bonome* case talks about, that even if you're revealing things that are intimate related to another party with respect to yourself.

It's not just, I'm happening to talk about myself. This -- I went to the store earlier or something like this. This is your own life, your own body, your own history. If it's something that there's something there that it takes, you know, some kind of guts, some kind of bravery, something to want to share this about yourself.

And I think that that's something that got lost in

translation is that this was a very intimate story that was told by Ms. Kalil with respect to herself. She's mentioning how she's a virgin at marriage, how she's married to someone who's her best friend, how she went to doctors, sought medical interventions. This is a very painful story. This is a woman sharing her own truth, and I think --

THE COURT: Well, I -- I mean, with all respect, I get that. And if you read the transcript, it sounds like that. When you watch it, though, it doesn't seem so -- you know, she raised the size of her former husband's penis on her own. She wasn't asked about it.

In fact, the question -- the previous question was, So you guys moved in together?

And she said, Well, wait, and she took the conversation in that direction. She typed it on her phone. She showed the phone to the -- the interviewer, and when she was doing so, she was giggling and smirking and laughing. That doesn't sound like sort of a poignant opening into her most personal affairs.

MR. BIALICK: A couple things. First of all, in -- as was established in *Cohen v. California*, there's a lot of deference that speakers are given in the way that they tell their own story and that it becomes a very dicey proposition if a Court is going to micromanage, basically saying, this message was legitimate, but we don't like the

way that you told it, or you told it while laughing, or things of that nature.

THE COURT: No, I was just responding to your comment that this has been lost -- in part it's been lost, because if you watch the video, you see your client laughing and giggling and -- and seeming to have a good old time talking about this. So this -- this poignant, brave opening of herself, it sort of doesn't jive very well with what you see on the video. I agree with you that that's not constitutionally relevant.

MR. BIALICK: Well, one thing that I would say with respect to that, Your Honor, is different people work a different way. And I think what's very clear that comes out from the text is sort of a "laugh so you don't cry" type of thing. Not everyone is going to share their story, even a very painful story, in the -- in the same way.

Some people, their defense mechanisms is when they reveal it, they're going to basically have to frame it that way as a defense mechanism. But this is all speculation.

What I think is -- is critical is the fact that the phrase that's being used -- I mean, we're talking about, you know, the trauma. I can't put on the internet. We're talking about sex being impossible. The divorce from her husband. This is a 12-minute-long discussion, and I think that that's a critical thing, that the fact that what we're

talking about here, which was never even directly said at any point, was maybe half a minute in relation to a 12-minute-long discussion of a variety of very serious themes.

They're talking about trauma dumping. They're talking about, you know, basically laugh so you don't cry. I mean, these are all in here, and so I think that this is the -- it's the height of taking things out of context. I mean, this is the *Snyder* case. This is finding one minute, one specific communication and saying, This is offensive.

THE COURT: Well, I think it's one -- it's not like a floating fragment that was said in the -- I mean, there was a -- a pretty good chunk of the segment that was about the marriage and the end of the marriage and why the marriage ended, and it -- it is a theme.

She continues to return to it during that, or the interviewer invites her to return to it during that. So I don't think it's quite that -- that fragmentary, but I totally get the idea that you have to put this in context, and you can't just take the sentence out and just look at the sentence.

Let me return you to the First Amendment, because I'm not sure I understand your position. So let's suppose that someone like Haley is talking about herself. It's autobiographical. She's telling the story of her life to

somebody. But in doing so, she discloses -- she gives publicity to a matter concerning the private life of another, that is Matt, and that would be highly offensive to a reasonable person, and that would not be of legitimate concern to the public.

Can she be held liable for -- if she -- if all the elements are met, even though it's in the context of her talking about herself?

MR. BIALICK: I do think that it's relevant, the specific subject matter. Whether it rises necessarily to the full level of public concern, I do take your point, Your Honor. And I think that there's -- legitimate to what is actually being said here, and that's why --

THE COURT: So there -- you would concede, just in the abstract -- I'm not asking you to concede about your client in this case, but there could be autobiographical statements that could hold one open to liability consistent with the First Amendment?

MR. BIALICK: Yes, and I think I could actually give a reasonable example.

THE COURT: Okay.

MR. BIALICK: If basically the comment was nothing but dis -- gratuitously disclosing the size of a penis, nothing else, no discussion about this affected my marriage, this affected my sexual health, just my ex-husband's penis

was like this, that would be something that it would be autobiographical in the sense that it would be -- it would require her to be talking about an experience she had, because she has to have had firsthand experience, but there's nothing to her personhood.

There's no value to the marketplace of ideas. There's nothing beyond a disclosure of raw facts that you happen to have firsthand knowledge. I think it's categorically very different when you're talking about yourself, your body, your life, and even the comments to the restatement that I had sent to the Court specifically talk about marriage and divorce as being something of a legitimate public concern. So this is not --

THE COURT: Yeah, but they -- those same comments -- you're right about marriage and divorce, but they also -- those same comments continue to cite sexual relations as sort of the core of private. You know, they have the comment in there is even the famous actress has some right to privacy in her sex life.

So -- and that's what we have here. I mean, we have -- it's beyond just -- she -- I think she makes a comment shortly before she goes to her phone that's something like, you know, we -- we -- he wanted children. I wasn't ready, and there was some other stuff, and dot, dot, dot. That's obviously fine; right?

And she's explained, we were -- we got along great. It was a good marriage, but he wanted children. I didn't. There were some other things going on, dot, dot, dot. No question that that would not be -- hold her open to liable. It's -- it's crossing that -- you know, the reason we're here is because she went further.

MR. BIALICK: And what I would say for that is one thing that was crystal clear from the text is "the biggest factor." So this isn't -- earlier on, it was more nibbling around the edges, but talking about "the biggest factor was this."

I think that if it was just a discussion of, you know, hey, we're having a freewheeling discussion of marriage, this is about our sex life, that -- I would still think that there would be protection, but that could be seen as something that it's a little bit closer to the line. But this, what it is is she -- the reason why, according to her, that she got divorced is because of sexual pain. And that can mean so many different things.

If you just say that, people aren't going to know what you mean. I mean, you know, was there some kind of attack? Do you have a medical condition? It doesn't provide much information. The only way for someone to understand why she got divorced was because of sexual trauma, and the only reason they can understand why the

sexual trauma was inflicted was because of the size of his penis.

So there was nothing gratuitous about it. Without -- without disclosing that information, it would have been a half truth, or not even a half truth, explaining why she got divorced. And I think that's a critical distinction here.

THE COURT: Let me ask you about a different topic. I noticed that in both the elements of the tort as described and in the Minnesota -- we just don't have a lot in Minnesota case law. I mean, you've cited what we have. They -- they never use the expression "of concern to the public." It's always "legitimate concern to the public." Legitimate public concern.

What do you -- what can you tell me about what the case law says is the difference between public concern and legitimate public concern?

MR. BIALICK: All I can say is what the case law that has looked at the issue does say on it, and I have -- I have not seen any case that has looked into that particular issue, that has tried to differentiate between a public concern and a legitimate public concern. And so what I think we're left with is the restatement comments and what various cases have done on it, which is essentially take that as an innocuous phrase that doesn't modify the public

concern in a meaningful way.

THE COURT: I saw in -- and thank you for sending it. This was really helpful to have this. It says, "In determining what is a matter of legitimate public interest, account must be taken of the customs and conventions of the community; and in the last analysis what is proper becomes a matter of community -- of the community mores. The line is to be drawn when the publicity ceases to be the giving of information to which the public is entitled, and because -- and becomes a morbid and sensational prying into private lives for its own sake, which a -- with which a reasonable member of the public, with decent standards, would say he -- that he had no concern."

This is a -- you know, obviously this is written in the old -- older kind of language of some of the statements, but that sounds almost like obscenity. You know, it sounds very similar to -- as you know, we decide whether something's obscene by community standards, and what I'm wondering is -- is it sounds like that's the law. The line is, Given the mores of the community, is this something of legitimate public interest or is this just sensational prying into private lives? Is there room for a jury to make that decision, or is -- are we clear that that's the judge's job?

MR. BIALICK: In the *Freborg* case, it was very

crystal clear that the issue of public concern is a question of law. *Snyder*, very clear that it's a question of law, and even expressing the concerns in *Snyder* about a jury making these types of determinations.

THE COURT: So what do I do when -- I mean, Haley and I are entirely different generations. I've never heard of her before this case. Don't take it per -- you'd never heard of me either, so that we're where we are.

The -- I've never heard of her. I never heard of the guy who interviewed her. I had only had the vaguest notion of what a content provider is. I'm on zero social media. Judges don't like to make it easy for people to find them and threaten them and stuff.

I would seem like a -- not a great person to decide. I don't even know what our community would be here. I mean, obviously her audience is worldwide. Is it a worldwide community? Is it -- is it Excelsior? Is it -- I -- I don't -- what -- what -- how would I go about deciding this when, according to -- putting aside any First Amendment issues, but according to the restatement, I'm supposed to apply community mores in deciding where this line draws.

MR. BIALICK: Well, first of all, I will make the point that this is the restatement, and while it was certainly referenced, it's not necessarily on the whole

cloth and bringing everything in.

THE COURT: Yeah, except that, you know, the Minnesota courts keep returning to it.

MR. BIALICK: Well, a couple things with that. First of all, the fact that I think it's completely superseded by this idea that it's a matter of law and the jury doesn't decide it, because say that -- so that part is crystal clear from applicable law.

THE COURT: Okay. And I accept that that's probably true, but I still have to have -- I can't just decide it by plucking something out of the air. I need -- how do I decide what the community mores are?

MR. BIALICK: Well, first of all, I would note the fact that this specific language relates to the newsworthiness element specifically. So the newsworthiness element relates to marriage and divorce. That's not a global, overarching thing. I mean, first of all, if that was applied to every single type of thing that could involve invasion of privacy, then this would permeate all of our cases.

There's not been any reference to this specific issue in any of the cases that I've seen. And I would say that even if you apply the marriage and divorce, the newsworthiness element is requiring a look at that. Different things, like an autobiographical account of sexual

trauma, is not within that particular ambit of the restatement, and I would say that that would be something that would fall outside of.

THE COURT: Okay. What -- I was wondering, from the way you write this -- the way you write this up, your -- the way you wrote your brief, what is there about a celebrity, especially a celebrity who's out there being autobiographical, talking about her life, that you think could give rise to liability under this tort?

You've given one example. So if -- if Haley had just been joking about the size of her former husband's penis but hadn't put it in the context of the impact it had on the marriage and ultimately causing divorce and stuff, do you think that would be an example of where he might have been able to recover?

MR. BIALICK: Potentially, and I do think that even the restatement that has been cited that there's a categorically different but similar types of things as say a third party. I think the example that was given is a third party talks about like an actress is I think they -- like the sex life of an actress.

So she's not talking about her own life. It's a third party is -- is coming in and saying these things, that the restatement had provided some basis of saying that that would have been a different situation. And I think in

particular, the best example of what you're looking for is the *Michaels* case that when -- like, say it was literally nothing but raw sexual imagery, which under the most tenuous definitions can be considered speech, but if it's nothing but a pornographic video, liability was found to be potentially applicable there because of the content of the communication.

So it's not this categorical you could never recover rule. There are different pockets that there would still be a robust and legitimate area of recovery.

THE COURT: Does -- I know you've said this, and I just want to -- in your brief, but does -- does Haley's motive matter?

I mean, suppose -- suppose that discovery went forward, and they did a forensic analysis of her cell phone, and they found that before she sat down with -- with this guy to do this interview that she told her, I don't know, manager or whoever, people that help her, people on her team, that I'm going to -- you know, I'm going to make this revelation. She describes it, and she says, I -- you know, this should -- we need something until the next big thing, and this will help keep me in the public eye and, you know, blah, blah, blah.

So let's just say that there was evidence that it was just crass -- I shouldn't say crass. It was -- the

motivation was simply to keep the viewership, membership, whatever you call them, followers high and the ad dollars flowing in. Would -- it doesn't make any difference at all in your view?

MR. BIALICK: No, Your Honor, or at the very least, I think it's in a very constrained, not -- nonfact-specific way. Well, first of all, I think it's instructive to look at the elements of the cause of action, and motive is not one of those causes -- or one of those elements.

And also, it's -- I mean, even I think cases like the *Snyder* case talks about how -- how difficult it is to try to get into that type of granular analysis. Because when you're talking about motive, you're almost always going to be talking about a factual specific inquiry that -- forget motion to dismiss, summary judgment motion, you're going to be almost certainly going to have a jury looking at that issue.

That could have been the law. That's not the law. That's not the law under *Snyder*. That's not the law under *Freborg*, and even on *Freborg*, which flirts with different elements of looking at things, one of the things that they -- they mused on some stuff with respect to the objective facts that were on the record. One of the things that I thought was actually very striking is the length of

time between, you know, the initial underlying relationship and when the speech at issue came out. And it was like five years or so, which it's, you know, remarkably close to the timeline we had in this case.

And so the judges did a little bit of speculation, not in a way that turned it into a fact question, and basically said if this was something that was, you know, just about, you know, a gripe or something, it would have happened sooner than that. I think that that was constitutional thin ice that they were sliding into, and I think that any statements related to that should be seen as, you know, closer to dicta.

That's not something that I minimize often, but as much as I think what's more instructive is to look what the court did as opposed to some musings, and what they did was reaffirm the firm rule that this is a determination to be made as a matter of law, and they didn't let something come in, an exception. You let that exception in here, it's never something that will be resolved as a matter of law.

THE COURT: Okay. I don't think I have any other questions for you. Is there anything more that you wanted to say that we haven't talked about?

MR. BIALICK: Let me just check my notes.

THE COURT: Sure, yeah, take your time.

MR. BIALICK: I think that covers it from my

perspective, Your Honor.

THE COURT: All right, thank you.

Mr. Saba.

MR. SABA: Good morning, Your Honor.

THE COURT: Good morning. Just let me know when you're ready to go there.

MR. SABA: Give me one second before you put me in the hot seat. Okay, go ahead.

THE COURT: So I'm going to largely ask you the same questions, just to get your perspective on these.

First of all, tell me what your understanding would be between the relationship between the First Amendment and the elements of the tort. I mean, are they like this (indicating)? Is there some difference -- is there something that could meet all the elements of the tort but would violate the First Amendment? What's your view on that?

MR. SABA: Very fair question, Your Honor. So clearly the right to privacy is not in the United States Constitution, nor is it in the Minnesota State Constitution, but the freedom of speech is. However, I have to believe when the Minnesota Supreme Court ruled on *Lake*, they clearly understood what the Minnesota Constitution held regarding free speech. And I'll get to that in a second.

When the Minnesota Supreme Court established the

right to privacy as a common law tort cause of action, it didn't say anything, quite frankly, about the First Amendment in that case.

THE COURT: True.

MR. SABA: However, the Minnesota -- Minnesota Legislature recently did establish via a new version of their anti-SLAPP protection two years ago, which is not this motion to be clear. This is not a First Amendment motion in the sense that it's falling under that statutory scheme. However, I have not seen a single case that's come out of the Minnesota state court or this District Court or this relevant Court of Appeals that says that the First Amendment fully trumps all right of privacy types of cases. I think it's firmly established that an individual can have a right to privacy cause of action if it meets the appropriate elements, and I think that's firmly established.

THE COURT: Are you aware of -- are you aware of any case anywhere in our country where a court said all the elements are here of -- of publicity given to private life, but we can't have liability because of the First Amendment? Did you -- have you run across any such cases?

MR. SABA: No current cases. I think some of those existed years and years ago in the '50s, et cetera, but I think the -- my understanding of almost every state law on this issue is that almost every state has a right to

privacy common law tort. And the United States Supreme Court has even recognized that as well in various iterations, nothing directly on point here, but I've yet to see a United States Supreme Court decision saying the First Amendment freedom of right to speech trumps all right to privacy causes of action as a matter of law.

THE COURT: Sure. Let me turn to a different topic, and that is this -- this use of the term legitimate -- legitimate public concern.

One of the struggles I have in looking at this case is obviously what Haley said about Matt was of public interest. I mean, it was -- you know, there was lots of news coverage of it, and it was in our local paper here, and there was a lot of news. So there's no question that it was of public interest. And in our, you know, celebrity-obsessed, internet-driven age, you know, there's a constant craving demand for details of the lives -- the private lives of celebrities. So there's no doubt that this is of public interest. Is that the same as being of legitimate public concern?

MR. SABA: No, and let me explain why. The difference between the cases that have been cited by the defense and what we're talking about here is a lot of those cases talked about crimes: rape, sexual assault. Those are of legitimate concern. For example, the 'me too.' Movement.

Those were social issues that people are repugnant about, that people were upset about, and so when people talked about those types of events, those were public concerns.

That wasn't this. That's not what happened here. She did not get on the broadcast to talk about rape, incest, un -- you know, un -- unconsensual sex. She talked about the man's genitalia, which is not of public concern. And I think the Minnesota Supreme Court has even said the private sexual affairs -- consensual sexual affairs and a person's anatomy are of very much the most private of things that people keep.

Other things that might be super private? Taxes. You know, for example, there are certain lines that you just don't cross, and here, she crossed the line.

THE COURT: So let's explore where she crossed the line. I think you would have a much stronger case if she had just thrown this out as a joke on a -- you know, a talk show or something like that, but it is couched in a lengthy discussion of her upbringing and her life. And -- and I assume that generally speaking, just -- not asking you to concede the specifics here -- but generally speaking, her discussing her -- the fact that she was married to your client, that the marriage was happy, that the marriage ended, all that would be of legitimate public interest?

MR. SABA: Yes. I think general discussions about

my marriage ended because we didn't want to have children, or my marriage ended because we didn't get along, or my marriage ended for private reasons certainly could have been acceptable.

THE COURT: What about if -- if what she had said was we -- you know, a major contributing factor is that we were sexually incompatible without giving any details. Is that of a legitimate public concern?

MR. SABA: I actually think that would have been okay, to be fair. I think where she crosses the line is where she goes to the description of the man's genitalia, and that is where it becomes the privacy issue. And it's not a matter of large versus small, it's a matter of any description.

If the roles had been reversed and a man was describing this of a woman, people would be up in arms. And so I think that there are certain things that have to remain private, and that's certainly one of them.

THE COURT: So it is of legitimate public concern that the Kalils' marriage, one of the causes of it, was sexual incompatibility, but it isn't of public concern to know what the details of that -- that incompatibility were?

MR. SABA: No, but I -- personally, I don't think any of it's part of public concern, to be fair. I was just going with your hypothetical.

THE COURT: Uh-huh.

MR. SABA: I don't think their marriage is of public concern at all.

Mr. Kalil has resorted into private life after he played football. He's one of thousands of people that played football. He's not a celebrity, with all due respect to my client. There are many more famous football players.

If she was talking about somebody else that maybe every household name would know, may be different. But you're talking about a private individual who happened to be married to an individual who was not a celebrity at the time either. And so she's describing a private marital affair between two private people, so I don't think this has anything to do with public concern at all.

THE COURT: Well, at the time they were married, he was a -- you know, a starting tackle in the National Football League.

MR. SABA: Sure.

THE COURT: He was -- would you say he was a celebrity at the time they were married?

MR. SABA: You know, again, with all due respect to my client, there are 1,696 football players. Each team has a 53-man roster, and so --

THE COURT: Yeah, but he wasn't just any -- I mean, you know, I'm a lifelong Minnesotan.

MR. SABA: I understand.

THE COURT: I'm a Minnesota Vikings fan. That's hard. He was the, what, third overall pick --

MR. SABA: He was a first round -- he was a --

THE COURT: -- in the draft, and he was -- he came in with a lot of publicity, and he wasn't some seventh round, you know, outside linebacker or long snapper. I mean, he was pretty well known.

MR. SABA: That's fair, but he also wasn't Randy Moss or Adrian Peterson, and he's not on ESPN, and he's not doing broadcasting, and he's not taken any career post football that would continue any public life that he may have been in at the time that he played. But yes, there was fanfare when he was drafted.

THE COURT: So if he's a celebrity then, which I think he is, and she's a celebrity now, which you don't seem to contest, so we have a celebrity now talking about the reasons for the breakup of her marriage to a celebrity then. That sounds like public interest, or at least interest if not legitimate public concern.

MR. SABA: I mean, I suppose it's interesting, but whether it's of a public interest. Again, saying you're divorced is of public record; right? So there's no issue there. It's the reasons for the divorce that the further they go into the details about people's private lives would

be something that crosses the line in -- in the regard to the tort that Minnesota has established.

THE COURT: So I was interested in reading the commentary in the restatement and -- about this -- what the restatement says about how you decide what's the subject of legitimate concern versus not legitimate concern. And there's this discussion in which I read -- I won't read it again -- about this is a matter of community mores.

And I don't remember -- that is the type of concept we see a lot in obscenity cases, of course. I don't remember seeing that discussed in cases, but I haven't read that many cases. Have you seen any judge apply that concept and seen what they looked at, what kind of evidence they referred to? I'm trying to decide how I would -- if I -- if I take the commentary to the restatement seriously how I would go about deciding what the community more is on this. I don't even know where I'd start.

MR. SABA: Well, I agree with Mr. Bialick that there are at least no cases that I've seen either that discuss the definition of legitimate in this context or more in depth on this issue. However, what I do want to respond to is the more important question is, how do you decide? That's why a 12(b)(6) motion is not the appropriate vehicle to dismiss this case.

THE COURT: Yeah, I saw that argument. What is it

specifically that you think, if we go forward with discovery, that you could discover? I realize you don't know until you know, but what are the types of information that you could discover that would inform my decision that I don't already have before me?

MR. SABA: That's fair. A couple of things. First, we would be able to bring in experts to talk about what is the community standard to educate you, both sides would do that. But more importantly, what you touched on before, is that what would her motivations be? We do know now --

THE COURT: Do you think that is relevant?

MR. SABA: I do, because what we know now, which we didn't know when we filed the complaint, because people have reached out to us, is that this wasn't the first time that she's made this joke or this comment that she has decided to use for purposes of click bait. In fact, we know that she went on another podcast that was recorded and wasn't live, and she made the same comments, and then immediately thereafter instructed the person who had recorded the podcast to not play it, because she was concerned it would violate the rights of privacy of Mr. Kalil.

That, we believe, will have an important factor in discovery to show what her motivations were, that she knew

this was a private issue, she knew that this would generate publicity. She asked somebody else not to publicize it. Then when she did it on the livestream, it did exactly what she expected it to do.

THE COURT: So you think motive is relevant to what part of the -- which of the elements of the tort?

MR. SABA: Yeah, that's a good question. Well, I think that, quite frankly, they've conceded the three other elements.

THE COURT: For purposes of today.

MR. SABA: For purposes of today, but certainly it would go to publicity. It would go to her knowledge that it -- it concerns the private life of another.

You know, she might also -- might believe that -- it shows that she's -- it's highly offensive as well, but most importantly, she knew that it was something that would generate the publicity that it did. And I think that's what is the issue here is she knew she could take private facts and publicize it for the purposes of gaining followers, which translates to money, of course, as you hopefully have been educated on that.

THE COURT: Yeah, yeah. So do you agree with Mr. Bialick that ultimately the question of whether this is about a matter of legitimate public concern is a matter of law for the Judge to decide?

MR. SABA: I do believe it's a decision for the Court but only upon an examination of a full record.

THE COURT: Right. You just think I don't have what I need to make the decision right now.

MR. SABA: I believe it should be a Rule 56 issue.

THE COURT: Okay. I don't have any more questions for you. Is there anything more that you wanted to say this morning? You can go take your -- take your time looking at your notes.

MR. SABA: No, I'm good, Your Honor, and I appreciate the discussion about the Minnesota Vikings. Of course, as a lifelong Rams fan, I -- you know, I always enjoy --

THE COURT: Driving in today, that's all they were talking about is the Rams and the -- the quarterback and why -- why McVay looks so pouty in his press conference and all that kind of stuff.

MR. SABA: Yeah, apparently it came out that they had some secret long conversation before the draft for a couple hours. I don't know, but we'll see. For now it's Matthew's team as they say.

THE COURT: Yeah. All right, thank you.

MR. SABA: Thank you.

THE COURT: Thank you for coming in.

Mr. Bialick, is there anything you wanted to say

in reply?

MR. BIALICK: Nothing, Your Honor.

THE COURT: Okay.

MR. BIALICK: Unless you have any further questions for me.

THE COURT: I don't have any further questions. I will take the motion under advisement and get an order out as soon as I can.

We're running a little slow these days. As you know, we had Operation Metro Surge here, and that kept us really busy. And then that meant, like, I had to push everything off, and so I'm trying to deal with the stuff I pushed off, and so it's -- it's just -- we're really -- we're really -- the backlog is really severe right now. So -- but I'll do my best to get an order out to you as soon as I can.

*(Court adjourned at 9:11 a.m.)*

* * *

I, Janell M. Gruber, certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter to the best of my ability.

*s/ Janell M. Gruber* Janell M. Gruber Date: May 19, 2026
Janell M. Gruber, RMR, CRR, CRC