UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| MATTHEW KALIL, Plaintiff, | Case No. 26-CV-0062 (PJS/DTS) |
| v. | ORDER |
| HALEY KALIL, Defendant. | |

Ryan D. Saba and Michael DiGiannantonio, ROSEN SABA, LLP; Christopher L. Lynch, BARNES & THORNBURG LLP, for plaintiff.

Matthew J. Bialick and Karl Joseph Johnson, MJB LAW FIRM PLLC, for defendant.

Plaintiff Matt Kalil ("Matt"), a former professional football player, and defendant Haley Kalil ("Haley"), a popular social-media content creator, used to be married. Matt now brings this tort action against Haley, alleging that she publicized private facts about him. Haley moves to dismiss this action on the ground that, because the facts she disclosed were of legitimate public concern, she did not commit a tort. For the reasons that follow, the Court agrees and grants Haley's motion.

## I. BACKGROUND

Matt, the fourth overall pick in the 2012 National Football League ("NFL") draft, met Haley while he was playing for the Minnesota Vikings. Compl. ¶ 11. The couple married in 2015. *Id.* After stints with the Vikings, Carolina Panthers, and Houston

Texans, Matt retired from football in 2019. *Id.* ¶ 13. Matt and Haley divorced three years later, in 2022. *Id.* ¶ 15. Matt remarried in 2024 and now lives quietly in California with his new wife and their child. *Id.* ¶¶ 6, 16.

Haley was born and raised in Minnesota, attended St. Cloud State University, and competed in pageants, earning the title of Miss Minnesota USA in 2014. *Id.* ¶ 7. Haley modeled for Sports Illustrated in 2019, 2020, and 2021, during which time she was still married to Matt. *Id.* ¶ 12. Following the couple's divorce, Haley built an immense social-media following across multiple platforms under the username "@haleyybaylee." *Id.* ¶¶ 19, 20. As of January 6, 2026, Haley had 15.9 million TikTok followers, 9.3 million Instagram followers, 8.07 million YouTube subscribers, 1.6 million Snapchat followers, and 1.3 million Threads followers. *Id.* ¶ 20. Following her rise to fame, Haley hosted the pre-Met Gala red carpet for E! News and secured similar gigs at the Tony and Academy Awards; collaborated with stars such as the Jonas Brothers, Courtney Cox, and Ed Sheeran; was nominated for a "Streamy Award" for a sketch featuring actor Jared Leto; made Time Magazine's list of Top 100 Creators 2025; and spoke at the 2025 Creator Marketing Summit. *Id.* ¶¶ 18, 21–23.

In November 2025, fellow social-media content creator Marlon Lundgren Garcia collaborated with Haley on a livestream on the Twitch platform ("the livestream"). *Id.* ¶¶ 25, 28. At the time this lawsuit was filed, Garcia had 1.5 million Twitch followers,

3.7 million Instagram followers, 4.6 million TikTok followers, and 766,000 YouTube subscribers. *Id.* ¶ 25. Haley joined Garcia in person in Minnesota, as part of Garcia's "Mar-Athon" challenge to visit all 50 states in 28 days. *Id.* ¶¶ 26, 27. The livestream was uploaded to YouTube and memorialized in a video titled "I Opened Up To Haylee Baylee." *Id.* ¶ 29; *see also* Marlon, *I Opened Up To Haylee Baylee*, at 34:00–46:00 (YouTube, Nov. 4, 2025), https://www.youtube.com/watch?v=JiFXnE043hI ("YouTube excerpt").

During the livestream, Garcia and Haley sat across from one another at a small table in Garcia's recreational vehicle, and the two discussed, among other things, Haley's marriage and divorce. *See generally* YouTube excerpt; Bialick Aff. Ex. A (written transcript of excerpt). Without using Matt's name, Haley said that she and her (only) ex-husband are "still friends," that he is the "greatest guy in the world," and that he is "doing good" and is remarried with a baby. Bialick Aff. Ex. A at 2:7–15; 4:14–15. Although Haley and Matt had been "best friends," Haley explained, he wanted kids, and she was not ready. *Id.* at 5:1–3. She noted that the two had "a couple other issues" that led to the decision to end their marriage. *Id.* at 5:3–5.

After Garcia asked Haley a few more questions about her marriage and its dissolution, Haley typed a private message to Garcia into her phone—ostensibly to put the reasons for her divorce "into perspective." *Id.* at 8:3–11. As she typed, Haley remarked that Garcia's face was "going to be hilarious" when he read the message. *Id.*

at 8:13. After reading the private message, Garcia thrice repeated "shut the fuck up." *Id.* at 9:3–10. Haley, nodding and smiling, said that she was being serious and that she tried "it all . . . . [t]herapists, doctors," even investigating "lipo type of shit." *Id.* at 9:5–16; YouTube excerpt at 37:50–38:35. Haley joked that her "life is a comedy and it writes itself," and confirmed that the issue described in the private message was "the biggest factor" in the divorce. Bialick Aff. Ex. A at 9:19–10:3.

As Garcia and Haley continued to talk, it quickly became obvious that Haley was referring to the size of Matt's penis. "[H]e's like 0.01 percent of the population, okay," Haley said, adding that "[w]e tried everything . . . you're going to be in tears type of shit." *Id.* at 10:14–11:2. Garcia responded: "That's like one of the craziest stories I've heard." *Id.* at 11:3–4. Haley characterized the experience as involving "trauma I can't put on the Internet," *id.* at 11:7–8, but said that it was "just bad luck," *id.* at 12:12. Again, Haley insisted that her ex-husband is "such a good person" and "a really good guy." *Id.* at 13:8–14:14.

Later, as Garcia typed a private question for Haley, they both assured their livestream audience that the secrets they were discussing (which at this point weren't too secret) were "nothing crazy"—but Haley sheepishly noted the irony that they were saying so "as we giggle and type into a phone." *Id.* at 17:14–18:4. In response to the new private message, Haley acknowledged that a certain aspect of Matt's penis was

"[t]otally fine" and "like, average," but she then said (moving her hands along a horizontal plane) that "he was just . . . like two [C]oke cans stacked on top each other. Maybe even a third . . . ." *Id.* at 18:9–25; YouTube Excerpt at 43:25–44:10. Haley typed a final private message for Garcia, who remarked "[o]h my God," before Haley said that it was "like a funny joke to us now . . . you just have to laugh at it." Bialick Aff. Ex. A at 19:4–8. After a bit more conversation, the segment wrapped up with Haley once more commending Matt, whom she credited with inspiring her "to be a way better person." *Id.* at 23:5–14. "After I got divorced," Haley explained, she thought "[d]amn, I'm going to be like him." *Id.*

Meanwhile, comments from live viewers poured in, mostly about the thinly veiled topic of the private messages. Compl. ¶¶ 30, 32. Media reaction soon followed. Headlines included "Haley Kalil Says NFL Husband's Size Sparked Divorce, 'Two Coke Cans'" and "Influencer Haley Baylee insists she 'cares deeply' about ex Matt Kalil's privacy despite wild penis confession." *Id.* ¶ 41. Some media reports focused more on Matt, such as reports that "Ex-NFL Star Matt Kalil's 'Size' was Known Among Players" and that Matt got a "$300k offer from adult site after influencer ex admits their marriage ended due to his penis size." *Id.* ¶¶ 46, 47.

Matt and his current wife had to bear the brunt of offensive direct messages and comments on their social-media accounts. *Id.* ¶¶ 49, 50. Haley conducted a follow-up

interview with the publication Page Six, in which she remarked that it was "unfortunate that only one fragment [of the livestream was] being amplified, because it doesn't capture the full story of how meaningful things were to me." *Id.* ¶ 55. Matt filed this lawsuit on January 6, 2026. ECF No. 1.

## II. ANALYSIS

### *A. Standard of Review*

In reviewing a motion to dismiss for failure to state a claim under Fed. R. Civ. P. 12(b)(6), a court must accept as true all of the factual allegations in the complaint and draw all reasonable inferences in the plaintiff's favor. *Perez v. Does 1–10*, 931 F.3d 641, 646 (8th Cir. 2019). Although the factual allegations need not be detailed, they must be sufficient to "raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). The complaint must "state a claim to relief that is plausible on its face." *Id.* at 570.

Ordinarily, if the parties present, and the court considers, matters outside of the pleadings, a Rule 12(b)(6) motion must be treated as a motion for summary judgment. Fed. R. Civ. P. 12(d). But the Court may consider public records and materials that are necessarily embraced by the complaint without converting the motion into one for summary judgment. *See Williams v. Emps. Mut. Cas. Co.*, 845 F.3d 891, 903–04 (8th Cir. 2017); *Gillick v. Elliott*, 1 F.4th 608, 610 n.2 (8th Cir. 2021). Here, the complaint

necessarily embraces—and the Court has considered—a 12-minute excerpt of the livestream. *See* YouTube Excerpt; Bialick Aff. Ex. A.

*B. Publication of Private Facts*

Under Minnesota law,[1] "[p]ublication of private facts is an invasion of privacy when one gives publicity to a matter concerning the private life of another if the matter publicized is of a kind that (a) would be highly offensive to a reasonable person, and (b) is not of legitimate concern to the public." *Lake v. Wal-Mart Stores, Inc.*, 582 N.W.2d 231, 233 (Minn. 1998) (quoting Restatement (Second) of Torts § 652D (1977)). Without question, Matt has plausibly alleged that Haley's comments about his penis were publicized, were about a matter concerning Matt's private life, and would be highly offensive to a reasonable person. *See* Compl. ¶¶ 57–60. The only question is whether the facts disclosed by Haley were of legitimate public concern. To be more specific, the question is whether those facts were of *legitimate* public concern, as the media attention given to the facts clearly demonstrates that they were of public concern. *See* Compl. ¶¶ 41–44, 46, 47; *Maethner v. Someplace Safe, Inc.*, 929 N.W.2d 868, 881 (Minn. 2019) ("[C]ourts may consider dissemination of the statements in the news media as one of

---

[1]The parties agree that Minnesota law applies. Def.'s Mem. at 10; Pl.'s Opp. at 15 n.1. When citing documents by ECF number, the Court cites to the electronically generated page numbers at the top of the page.

many relevant factors in determining whether the statements involve a matter of public concern.”).

The parties agree that determining whether a matter is of legitimate public concern is a question of law for the Court. Hr’g Tr. at 13:2–15:8, 29:22–30:5; *see also Mooers v. City of Lake City*, No. A13-2197, 2014 WL 3023368, at *7–8 (Minn. Ct. App. July 7, 2014) (affirming summary judgment based on legal conclusion that information was of legitimate public concern); *Bodah v. Lakeville Motor Express, Inc.*, 663 N.W.2d 550, 553–56 (Minn. 2003) (affirming dismissal based on insufficient allegations of publication). Minnesota courts have provided only limited guidance about when information is of legitimate public concern. *Cf. Mooers*, 2014 WL 3023368, at *7–8 (affirming that statements at a city council meeting were of legitimate concern to the public but also not actionable as they were public records). Minnesota courts have, however, consistently relied upon the Second Restatement of Torts. *E.g.*, *Bodah*, 663 N.W.2d at 557 (adopting restatement definition of “publicity”); *Mooers*, 2014 WL 3023368, at *7 (citing the restatement’s conclusion that public records are of legitimate public concern).

It is clear that matters of legitimate public concern are not limited to traditional “news” items—that is, to items that would typically appear on the front page of a newspaper or lead the evening news on television. *See* Restatement (Second) of Torts

§ 652D cmt. g (providing examples of "marriages and divorces" among "other similar matters of genuine, even if more or less deplorable, popular appeal"). Rather, for at least two millennia, the private lives of public figures have been of legitimate interest to members of the public. *E.g.*, *Carlisle v. Fawcett Publ'ns, Inc.*, 20 Cal. Rptr. 405, 422 (Cal. Ct. App. 1962) ("[T]here is a public interest which attaches to people who, by their accomplishments, mode of living, professional standing or calling, create a legitimate and widespread attention to their activities."). One of the most famous works of history—Suetonius's *The Lives of the Twelve Caesars*, written in 121—is a notoriously gossipy collection of biographies of 12 leaders of ancient Rome that includes many details about their sex lives. Then as now, a celebrity "relinquishe[s] a part of his right of privacy to the extent that the public has a legitimate interest in his doings, affairs, or character." *Id*. (quotation omitted).

Yet public *curiosity* does not necessarily equate to *legitimate* public concern. For example, although "the home life and daily habits" of an actress may be of legitimate public concern, "[t]here may be some intimate details of her life, such as sexual relations, which even the actress is entitled to keep to herself." Restatement (Second) of Torts § 652D cmt. h. A court must take into account "the customs and conventions of the community" in attempting to identify the point at which "the publicity ceases to be

the giving of information to which the public is entitled, and becomes a morbid and sensational prying into private lives for its own sake." *Id.*

Matt and Haley were indisputably celebrities during the time of their marriage and remain so today. *See, e.g.*, *Chuy v. Phila. Eagles Football Club*, 595 F.2d 1265, 1281 (3d Cir. 1997) ("Professional athletes, at least as to their playing careers, generally assume a position of public prominence."). Matt has chosen to lead a private life since the end of his playing career, but that does not mean that he is no longer a celebrity. *See* Restatement (Second) of Torts § 652D cmt. k ("Past events . . . may still be of legitimate interest to the public, and a narrative reviving recollection of what has happened even many years ago may be both interesting and valuable."); *see also Sidis v. F-R. Pub. Corp.*, 113 F.2d 806, 809 (2d Cir. 1940) (holding that even the "subsequent history" of a child prodigy who later "cloaked himself in obscurity" was a matter of public concern).

It is important to understand that Matt remains a celebrity for two reasons. First, Matt would be a celebrity even if he had never met Haley. He was not just a guy who was on the roster of an NFL team. Instead, he was the fourth overall pick in the 2012 NFL draft, and he played in the NFL for several years. He was paid tens of millions of dollars to play football, and he had considerable success—even being named to the Pro Bowl. Second, Matt is also a celebrity *because* he met Haley—specifically, because he

was married to Haley, who was a celebrity in her own right during their marriage, and whose fame has only grown since their divorce.

Haley's disclosures have to be considered in that context. *See Diaz v. Oakland Trib., Inc.*, 188 Cal. Rptr. 762, 773 (Cal. Ct. App. 1983) ("The social utility of the information must be viewed in context, and not based upon some arguably meritorious and unintended purpose."). If the only source of Matt's celebrity was his career as a football player—and if Haley was just a random social-media maven who passed on gossip about the size of Matt's penis to get a laugh or to attract attention—then the Court would readily find that Haley's comments were not of *legitimate* public concern.[2] But that was not what happened.

Haley's comments about Matt's penis arose in the course of an interview in which she was being asked about her prior marriage and its dissolution. Her comments—including her comments about Matt—were about *her* life, *her* marriage, and *her* divorce, all of which are topics about which her millions of followers have a legitimate interest. *Cf. Michaels v. Internet Ent. Grp., Inc.*, No. 98-0583, 1998 WL 882848, at *4 (C.D. Cal. Sept. 11, 1998) ("It is clearly established that the romantic connections of celebrities are newsworthy." (citation omitted)). Haley's comments were not vindictive or gratuitous; she was describing what she characterized as the main reason for the

[2]Haley does not seem to disagree. *See* Hr'g Tr. at 9:14–10:5.

breakdown of her marriage. *Cf. Johnson v. Freborg*, 995 N.W.2d 374, 387 (Minn. 2023) (noting that statement related to alleged sexual abuse was "not a personal attack in response to the relationship ending"); *Diaz*, 188 Cal. Rptr. at 773 (concluding that "humor at [the plaintiff's] expense removes all pretense" that the information was newsworthy).

True, Haley giggled and, at times, had the demeanor of a teenager telling a dirty joke. And Haley's comment about "Coke cans" was certainly crude. But all of her comments about Matt's penis size were in the context of describing the "trauma" she suffered during her marriage, the couple's seeking help from doctors and therapists, and ultimately the couple's decision to divorce. In short, Haley was discussing *her* life, not Matt's, and the law generally protects a person's speech about *herself*, even though such speech inevitably reveals details about others. *E.g.*, *Bonome v. Kaysen*, No. 032767, 2004 WL 1194731, at *6 (Mass. Super. Ct. Mar. 3, 2004) (granting motion to dismiss based on memoirist's "right to disclose her own intimate affairs" and tell "*her own* personal story," including sexual details); *Campbell v. Seabury Press*, 614 F.2d 395, 397 (5th Cir. 1980) (affirming summary judgment to civil rights leader whose autobiography disclosed details of the plaintiff only insofar as they related to his "close association with his older brother"); *cf. Haynes v. Alfred A. Knopf, Inc.*, 8 F.3d 1222, 1234 (7th Cir. 1993) (noting in dicta that sexual details "in the memoirs of former spouses and lovers is

common enough").

For these reasons, the Court finds that Haley's remarks about the size of Matt's penis and its impact on her health and marriage were remarks about a matter of legitimate public concern.[3] Thus, Haley's remarks were not tortious. Because her remarks were not tortious, the Court need not address her additional argument that her remarks were protected by the First Amendment. Haley's motion to dismiss Matt's claim for invasion of privacy is granted.[4]

One additional matter: At the hearing, Matt's attorney urged the Court to defer ruling on the issue of whether Haley's remarks were a matter of legitimate public concern until the parties could take discovery. Matt's counsel suggested that, in discovery, he could develop expert testimony regarding how a court should go about

---

[3]Courts have acknowledged in other contexts that, although graphic sexual depictions may cross the line, details about celebrities' sex lives are generally matters of legitimate public concern. *E.g., Carlisle*, 201 Cal. App. 2d at 747 (granting demurrer in case regarding a plaintiff's decades-old teenage marriage to a famous actress); *Michaels v. Internet Ent. Group, Inc.*, 5 F. Supp. 2d 823, 840 (C.D. Cal. 1998) (noting that while actor Pamela Anderson and musician Brett Michaels "must tolerate some public exposure of the fact of their romantic involvement," graphic "visual and aural details of their sexual relations" are not of public concern); *see also Jackson v. Mayweather*, 217 Cal. Rptr. 3d 234, 249–51 (Cal. Ct. App. 2017) (famous boxer's disclosure of ex-girlfriend's alleged abortion and plastic surgery were of public concern but copies of a sonogram and medical record were not).

[4]The Court also grants Haley's motion to dismiss Matt's unjust-enrichment claim. There is nothing unjust about Haley retaining any benefit she received as a result of her remarks—which, again, were remarks about a matter of legitimate public concern.

discerning whether a topic is of legitimate public concern, and he could elicit evidence about what motivated Haley to talk about Matt's penis. Hr'g Tr. at 27:21–30:5. As Matt concedes, however, the issue of whether Haley's remarks related to a matter of legitimate public concern is a legal question, and "expert testimony on legal matters is not admissible." *S. Pine Helicopters, Inc. v. Phx. Aviation Managers, Inc.*, 320 F.3d 838, 841 (8th Cir. 2003) (citation omitted). Moreover, motive is not an element of the tort of publication of private facts, so any evidence about Haley's subjective motives would be irrelevant.

ORDER

Based on the foregoing, and on all of the files, records, and proceedings herein, IT IS HEREBY ORDERED THAT defendant's motion to dismiss [ECF No. 12] is GRANTED and plaintiff's complaint [ECF No. 1] is DISMISSED WITH PREJUDICE AND ON THE MERITS.

LET JUDGMENT BE ENTERED ACCORDINGLY.

Dated: September 17, 2026

/s/ Patrick J. Schiltz
Patrick J. Schiltz
United States District Judge